

IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CHARLES LLEWYLN,
      Movant,

Vs.                                       CASE NO: ~~01-7261~~ - *00-6022CR♦MM*

UNITED STATES OF AMERICA,
      Respondent.
_____/

---

## MOTION FOR RECONSIDERATION AND CLARIFICATION

---

### JURISDICTION

The First Amendment to the Constitution stands for the proposition
Congress shall make no law respecting an establishment of religion,
or prohibiting the free exercise thereof; or abridging the freedom
of speech and to petition the Government for redress of grievances.


**COMES NOW** Movant **Charles Llewyln, pro se** respectfully invokes
the Constitution of the United States specifically the First
Amendment, Federal Rules of Civil Procedure Rule 59. In support
of this his pro se Motion, Movant states under pains and penalty
of perjury:

1. That in June or July 2001, Movant filed a motion pursuant to
Fed. R. Crim. Pr. Rule 12(b) contesting the Courts Jurisdiction
on an indictment that lack the essential elements. i.e. drug
quantity.



2. That on July 27,2001, the Eleventh Circuit Court of Appeals issued the Mandate, effectively denying Movant petition for a Rehearing.

3. That on August 8,2001 a report and Recommendation was issued by Magistrate Judge Sorrentino, to which this Movant never traverse as he has never received said Report despite his request for same. (See attached dated 11/11/01 to Clerk of Court).

4. That on September 4,2001 the Honorable judge Middlebrooks adopted the findings of the Magistrate Judge.

5. That on October 19,2001, the Court entered an Order directing the Clerk to close the case.

6. That on November 5,2001, movant filed a Motion for Reconsideration.

7. That on November 16,2001, the Court denied Movants' Motion.

8. That Movant had filed a timely notice of appeal, pursuant to Fed. R. App. Pr. Rule 4(a), invoking the Appellate Court Jurisdiction.

9. That on January 16,2002, the Honorable Judge Middlebrooks, entered an Order construing Movants' notice of appeal as an application for Certificate of Appealability.

10. That its based upon that ruling that the Movant now filed this motion for Reconsideration and Clarification.

(2)

MEMORANDUM OF LAW IN SUPPORT

Federal Rules of Appellate Procedure 3(c) provides that **"[a]n appeal will not be dismissed for informality of form or title of the notice of appeal.'** The comments to that section state that **"so long as the function of the notice is met by the filing paper indicating an intention to appeal, the substance of the rule has been complied with." Fed.R. App. 3(c) advisory committee's note (1979).**

By virtue of this Movant letter to the Court on August 12,2001, its aximatic that Movant did show his intent to appeal any adverse ruling by the Court.

The Court in its Order dismissing Movants Motion to Dismiss makes reference it had adopted the Magistrate finding that Movants' motion was dismissed as time barred. Respectfully the Court erred in its application of the Magistrate Judge ruling as indicative of the Eleventh Circuit decision rendered in **Candelario, Id as 240 F.3d 1300,** cert. denied 121 S.Ct. 2535 (2001). As shown above and as the record will indicate Movant (hereinafter **Llewyln**), filed his motion to dismiss in June 2001, Candelario was decided by the Eleventh Circuit Court of Appeals in February 2001, clearly then the Court had the benefit of that decision at its disposal and was aware that Llewylns' motion could not be time barred.

Although an unconditional plea does waive non-jurisdictional defects in the proceedings against defendant it does not waive jurisdictional defects. **See, United States v Fairchild, 803 F.2d 1121-1124 (11th Cir. 1986), United States v Meceham,626 F.2d 503, 510 (5th Cir. 1980). (FN1)**

---

FN1. **Bonner v City of Pritchard,661 F.2d 1206,1209 (11th Cir. 1981) (en banc),** adopting as precedent decisions of the former Fith Circuit rendered prior to October 1981.

(3)

In United States vs Candelario, the Court reasoned that: **"Although a defendant's constitutional objections will be timely if made at any time prior to sentencing, it is not necessary that it be made prior to sentencing. The rationale behind this is simple. if the indictment properly charges an ofense, it would be unproductive and run contrary to a defendant's interest to require him to object to the indictments failure to specify a quantity amount. If we insisted on an objection to the indictment, we would be effectively be forcing a defendant to claim that the Government undercharged him. That is, the defendant would basically be forced to assert that the Government could have indicted him for a section of 841 (b)(1)(A)or section 841(b)(1)(B) offense rather than 841(b)(1)(C) offense the government is currently charging. Because its the Government's duty to ensure that it has charged the proper offense, a defendant has no responsibility to point out that the Government could have charged him with a greater offense. Similarily, it would be fruitless to insist that at trial a defendant must request the court to instruct the jury to determine quantity. Section 841(b)(1)(C) permits a sentencing without regard to drug quantity, in which event a jury finding of quantity is unnecessary. Therefore to preserve his constitutional objections a defendant need only object at sentencing. "** FN2

The record is clearly develop that llewyln objected to the court finding he was responsible for five kilogram of cocaine. Llewylns' counsel even pointed out to this Court that the Government had the benefit of re indicting Llewyln. In his Motion to dismiss Llewyln only ask that he be properly indicted as he stand sready to contest the Government manufactured crime.

---

FN2 The sufficiency of an indictment is a jurisdictional issue which may be considered at any time; there will be no reversal absent prejudice unless the indictment cannot within reason, be construed to charge a crime. United States v Mallen,843 F.2d 1096 (8th Cir.1988)

A defendant's failure to question an indictment in advance of trial did not waive his later contention that it failed to charge an offense. United States v Willis,515 F.2d 798 (7th Cir. 1975)

Scanned Image - 001cv7261 Document 16 page 4 Thu Feb 28 08:31:06 2002

Furthermore, as Llewylns' motion represent the question of the
Courts jurisdiction, as in contrast to rights which can either
be forfeited or waived jurisdictional defects such as arising
from defective indictments cannot be procedurally defaulted,
because Federal Courts are courts of limited jurisdiction, deriving
power solely from Article III of the constitution and from the
legislative acts of Congress. **See, Insurance Corp. of Ir., Ltd
v Compagnie des Bauxites de Guinee**, 456 U.S. 694, 701, 102 S.Ct.
2099, 72 L.Ed.2d (1982). Courts cannot derive power to act from
the actions of the parties appearing before the courts. Id. at
702. Consequently, the parties are incapable of conferring upon
Federal courts a jurisdictional foundation otherwise lacking simply
by waiver or procedural default. **See, United States v Griffin**,
303 U.S. 226,229, 58 S.Ct. 601,82 L.Ed. 764 (1983)(**"Since lack
of jurisdiction of a federal court to touching the subject matter
of the litigation cannot be waived by the parties, we must upon
this appeal examine the contention".**).

Llewyln contends this court failed to address the issue
of jurisdiction that he raised as grounds to dismiss his indictment.
Federal courts are bound to assure themselves of jurisdiction
even if the parties fail to raise the issue. **See, Insurance Corp.
of Ir., Ltd.** 456 U.S. at 702 (**"[A] court... will raise lack of
subject-matter jurisdiction on its own motion."**) Fitzerald, 760
F.2d at 1251 (**" A federal court not only has the power but also
the obligation at any time to inquire into jurisdiction whenever
the possibility that jurisdiction does not exist arises."**) (citing
**Philbrook v Glodgett**, 421 U.S. 707 95 S.Ct. 1893, 44 L.Ed.2d 525
(1975); **city of Kenosha v Bruno**, 412 U.S. 507, 93 S.Ct. 2222,
37 L.Ed.2d 109 (1973).

In short because such claims cannot be defaulted, the Court
erred in ruling that Llewylns motionwas time barred, furtrhermore
in Lllewylns letter to this Court to withdraw his plea, he succinctly
stated that his indictment was defective, a matter this Court
fail to address.

Scanned Image - 001cv7261 Document 16 page 5 Thu Feb 28 58:31:06 2002

## CLARIFICATION

Llewyln remains somewhat puzzled by the course of events, the
United States of America prides itself on having the fairest judicial
system known to mankind, and rightly so. Llewyln contends that
he filed a motion sufficiently titled Motion to Dismiss pursuant
to Rule 12(b). Looking to the language of the Court Administrative
Order its equally clear that that the Court distinctly characterized
his motion as a motion to dismiss.**(See, Administrative Order)**.
Similarily  in the Governments' response, the Government made
reference and responded to Llewyln Motion as a motion to dismiss.

Due process allows an appeal from a lower court to the Appellate
Court within its jurisdiction by filing a notice of appeal within
a given period of time sufficient to invoke the Courts jurisdiction.
**See, Fed.R. App.Pr.Rule 3 &4;** By virtue of llewyln letter dated
August 12,2001, it clearly indicated Llewyln desire to take any
adverse ruling to the Eleventh Circuit. There remains a dispute
that Llewyln received the Magistrate Judge Report and Recommendation,
by virtue of Llewylns letter of August 12,2001, it was beyond
a shadow of doubt that his return address was listed as **Burke-
Catawba County Detention Facility, 148 Government Drive, Morganton,
North Carolina.** Hence, the Court was aware that Llewyln was no
longer at the addres where he filed his motion and by the date
quoted by the Court concerning the Magistrate Judge Report as
been submitted on August 8,2001, its improbable that Llewyln received
such documents.

As argued herein Federal Courts are courts of limited jurisdiction,
and whenever the question of jurisdiction arises, the court is
thus bound to assure itself of jurisdiction on the subject-matter.
A certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2)
is required for an Appellant to proceed with an appeal. **See,
Hardwick v Singletary, 122 F.3d 935,936 (11thCir.)** modified on
other grounds, **126 F.3d 1312,1313, (11th Cir. 1997).** The summarization
of the Courts Order leaves Llewyln who is but a layman at law
and who must give great deference to this most learned Court,

(6)

is that this Court duly advise in the premise has recharacterized
his 12(b) motion as a 28 U.S.C. § 2255 and his motion under Appellate
Procedure Rule 4  as a Certificate of Appealability. This can
be the only logical conclusion that this litigant can fathom.

If indeed this is the case and all indication says it is so, then
most respectfully the Court erred in two regards and this error
has the potential to deprive Llewyln of his one chance for marshalling
all his arguments in one motion to collaterally attack his conviction
in light of the Antiterroism Effective Death Penalty Act.**(AEDPA)**.

Herein, under the Declaration of Independence of 1776, the United
States Constitution and the Bill of Rights of 1791, which was
used by the Founding fathers to "enhance the 1787 document it
was intended for these States known as the United States to "have
one set of laws for all States and to enhance Article IV, section
2, Clause 1 was placed in the constitution.**(See attached exhibit)**.
Its by virtue of the United States constitution that llewyln know
offer his pleadings to the Court sufficient to show that the Court
erred in characterizing his  motion as a §2255 and his notice
of appeal as an application for Certificate of Appealability and
dismissing his petition.

Honorable Judge Middlebrooks this kind of recharacterization poses
a novel problem of judicial administration. the Antiterroism Effective
Death  Penalty Act (AEDPA) bars federal prisoners from attacking
their convictions through second or  successive habeas corpus petitions
except in very limited circumstances. **See Pub.L. No. 104-132,
title I, § 105,110¯stat.1214,1220 (1996) (codified at 28 U.S.C.A.
§ 2255).** Many pro se inmate petitioners are frequent filers of
inartfully drafted post-conviction motions. Over the years, district
courts have commonly recharacterized such pro se motions as §
2255 motions (the statutory means by which federal prisoners attack
their sentences on collateral review). Thispractice developed
for effiency's sake and out of a sense of fairness to pro se petitioners
whose claims are construed liberally. Under the aegis of AEDPA,
however with its sharp limitation on second or successive petitions,
if a district court recharacterizes a pro se petitioner's poorly

(7)

drafted post conviction as a § 2255 petition and dismisses the
motion on its merits, the petitioner is effectively barred from
later filing a full-fledged collateral attack upon his conviction.
Thus, under AEDPA, the practice of liberal recharacterization
that once opened the doors of the federal courts to pro se litigants
now threatens unintentionally to close them shut.

The Third Circuit following the lead of the Court of Appeals for
the Second Circuit, (**See attached opinions**) **Adams v United States,
155 F.3d 582 (2d Cir. 1998),** held, that district courts must first
take prophylactic measures before recharacterizing a pro se petitioner's
post conviction motion as a § 2255 or ruling on a § 2255 denominated
as such. More specifically, we prescribe that upon receipt of
a pro se pleading challenging an inmate's conviction or incarceration-
whether styled as a § 2255 motion or not- district court should
issue a form notice to petitioner regarding the effect of such
a pleading in light of AEDPA. This communication should advise
the petitioner that: **(1) Have his motion ruled upon as filed:
(2) if his motion is not styled as a § 2255 motion have his motion
recharacterized as a § 2255 and heard as such, but lose the ability
to file a second or successive petition absent certification by
the court of appeals; or (3) withdraw his motion and file one
all inclusive § 2255 petition within theone year statutory period
prescribed by AEDPA in § 2255.** The Court of Appeals went on to
note that since Miller did not receive notification of this nature,
set aside its decision to recharacterize his two post-conviction
motions. See, **United States v Miller, 197 F.3d 644 (Attached)**

By virtue of the enclosed authority Llewyln has shown sufficient
reason for this Honorable Court to reconsider its prior ruling
in light of the manifest injustice that Llewyln faces. **See, Arizona
v California, 460 U.S. 605, 615 n.8 103 S.Ct. 1382 75 L.Ed 2d
318 (1983); Sanders v Sullivan 900 F.2d 601,605 (2nd.Cir. 1990)
" Court may depart from prior ruling for cogent and compelling
reasons".** Llewyln contends that by virtue of the constitution
of the United States this court should give due weight to the
decisions enclosed herein.

**IN CONCLUSION**

Llewyln continues to aver under pains and penalty of perjury
pursuant to **28 U.S.C.§ 1746** that he has never received the Magis-
trate Report and Recommendation nor this Court final Judgement,
despite the fact he has asked for same.

Llewyln further contends that on September 6 & 27, 2000,
through his attorney levied objections both orally and in written
form the insertion and attribution of five kilogram of cocaine
for which the Grand Jury has never indicted him for nor did he
pled to. Also, on September 13,2000, Llewyln submitted via Certified
Mail to this Court a letter motion to which he made mention of
the fact his indictment was defective for failing to list the
aggravating element, i.e.; drug quantity, for which this Court
fail to address. **(See  attached).** By virtue of these objections
which are clearly detail in the record its conclusive and without
a shadow of doubt that Llewyln satisfied the criteria laid out
in **United States v Candelario, 240 F.3d 1300 (11th Cir. 2001)**,
and the Magistrate Recommendation fail to apply same to this case
presently before bar.

Furthermore under **Barefoot,** a substantial showing of the
denial of a right includes showing that reasonable jurist could
debate whether (or,for that matter agree that) the petition should
have been resolved in a different manner or that the issues presented
were "adequate to deserve encouragement to proceed further". **463
U.S. at 893 and n4, 77 L.Ed 2d 1090, 103 S.Ct. 3383.**
Clearly its been shown by the authorities herein and attach-
ments that the adoption of the Magistrate Report and Recommendation
to which Llewyln never received  nor had the opportunity to traverse
was  in error and its undoubtedly that reasonable jurist would
have debated and came to a contrary conclusion than this Court.
This Court had the benefit of **Candelario** whilst Llewyln motion
was been decided and even though its application was necessary
to  decide  Llewyln case before bar the Magistrate Judge clearly
refused to apply bona fide Eleventh Circuit precedent to Llewylns
case  before bar.

(9)

Its based upon the Constitution of the United States Due Process
Clause of the Fifth and Fourteenth Amendment that Llewlyn posit
that this Court consistent with due process should recognize that
he's been denied due process and a forum in which to bring his
grievances and as such he remains convicted on an indictment which
clearly fail to list an offense, furthermore Llewlyn contends
to this Court he is innocent of this Government manufactured crime
design to eviscerate him from his family.

Llewlyn seeks not to have his conviction vacated and be set free
from prosecution, but only to be afforded the chance to have his
case decided in a Court of Law consistent with the Sixth Amendment
to the constitution. Its base upon the authorities herein the
Constitution of the United States that Llewlyn ask this Court
that upon reconsideration any relief deem just and proper be afforded
to him.

It is readily seen by the application of law that Llewlyn remains
but a lay man at law and as such ask this Court to construe this
motion liberally and accept it for what it is, a motion for recon-
sideration.

Respectfully submitted,
Charles Llewlyn, Pro Se,

*Charles Llewlyn*
Federal Correctional Institution
2680 Highway 301 South
Jesup, GA. 31599

*February 2nd, 2002*

(10)

## CERTIFICATE OF SERVICE

I CHARLES LLEWYLN, HEREBY CERTIFY UNDER PAINS AND PENALTY OF
PERJURY THAT THE FOREGOING INSTRUMENT WAS DEPOSITED FOR MAIL THIS
DAY 2nd, OF FEBRUARY 2002, TO THE FOLLOWING:

HON. JUDGE DONALD M. MIDDLEBROOKS,
C/O CLERK OF COURT,
701 CLEMATIS STREET,
WEST PALM BEACH FLORIDA

ROGER STEFFIN, AUSA
500 E. BROWARD BLVD.
SUITE 700
FT.LAUDERDALE, FL. 33394

*Charles Llewyl*

Respectfully,
CHARLES LLEWYLN.pro se
# 60206-004
Federal Correctional Institution
2680 Highway 301 South, Unit F2
Jesup, GA. 31599

(11)

Eric ADAMS, Petitioner-Appellant,

v.

UNITED STATES of America,
Respondent-Appellee.

Docket No. 97-2263.

United States Court of Appeals,
Second Circuit.

Submitted Oct. 15, 1997.

Decided Aug. 20, 1998.

Defendant filed pro se motion for post-conviction relief, purportedly under rule of criminal procedure addressing pretrial motions, asserting that the court of conviction lacked jurisdiction. The United States District Court for the Eastern District of New York, Raggi, J., construed motion as having been made under applicable statute providing for motions to vacate sentence, and denied the motion, and denied the defendant's subsequent motion to withdraw the motion for relief. Defendant appealed. The Court of Appeals held that district court should not have re-characterized motion as one under statute providing for motions to vacate sentence.

Reversed and remanded with instructions.

**1. Criminal Law ⚖ 997.11**

At least until it is decided whether a movant's right to bring a future petition to vacate sentence can be affected by a conversion or recharacterization of a motion made under some other rule as being under the statute providing for motions to vacate, district courts should not undertake such recharacterization unless (a) the movant, with knowledge of the potential adverse consequences of such recharacterization, agrees to have the motion so recharacterized, or (b) the court finds that, notwithstanding its designation, the motion should be considered a motion to vacate because of the nature of the relief sought, and offers the movant the opportunity to withdraw the motion rather than have it so recharacterized. 28 U.S.C.A.

* The Hon. Jane A. Restani, of the United States Court of International Trade, sitting by designa-

§ 2255; Fed.Rules Cr.Proc.Rule 12(b)(2), 18 U.S.C.A.

**2. Criminal Law ⚖ 997.11**

In giving notice to the movant or the issue of recharacterization of motion under some other rule as one under statute, providing for motions to vacate sentence, care should be taken to advise movant of the one-year limitations period of the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C.A. § 2255.

**3. Criminal Law ⚖ 997.12**

Fairness demanded that the statute of limitations be tolled to afford movant an opportunity to file his first motion to vacate sentence, provided that he did so promptly, where the district court's ruling, improperly recharacterizing a motion under another rule as one to vacate sentence, when movant still had several months in which to file a motion to vacate, but had serious reason to doubt that he could satisfy Antiterrorism and Effective Death Penalty Act's (AEDPA) stringent limitations on successive motions. 28 U.S.C.A. § 2255.

Barr; D. Laswan, Federal Defender Division, The Legal Aid Society, New York City, for Petitioner-Appellant.

Sung-Hee SUH, Assistant United States Attorney, Eastern District of New York (Zachary Carter, United States Attorney, Brooklyn, NY, for Respondent.

Before: JACOBS and LEVAL, Circuit Judges and RESTANI, Judge.*

PER CURIAM:

Eric Adams was convicted of various crimes in 1996, and sentenced to a term of imprisonment for life, plus 45 years. We affirmed his conviction. *United States v. Adams,* 101 F.3d 684, 1996 WL 281858 (2d Cir.1996), *cert. denied,* ___ U.S. ___, 117 S.Ct. 261, 136 L.Ed.2d 186 1996). Acting pro se, Adams filed an application dated February 24, 1997, invoking Fed.R.Crm.P. 12(b)(2), and styled a "Motion to Dismiss All

tion.

Counts of Charged Indictment Due to United States Lack of Territorial Jurisdiction." Adams explained his belief that Rule 12 authorized such a motion:

A motion contesting the District Court's geographical jurisdiction (the place where the crime was committed) can be raised at anytime. Rule 12(b)(2) Fed. Rules Crim. Proc. 18 U.S.C.A.

On March 11, 1997, the United States District Court for the Eastern District of New York (Raggi, J.) construed the motion as having been made pursuant to 28 U.S.C. § 2255, and denied it by memo endorsement:

The crimes of conviction all involved activity in or affecting interstate commerce. Thus, there is no merit to this motion (which the court entertains pursuant to 28 U.S.C. § 2255) to vacate judgment for lack of jurisdiction. Motion *denied.* Certificate of appealability *denied.*

(emphasis in original).

On March 25, 1997, the district court's pro se office received Adams's application "to withdraw motion of Lack of Territorial Jurisdiction of the United States." In this application, Adams explained that he was planning to "present all his habeas claims in a single later motion that might be barred as successive, within the meaning of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") § 106, 28 U.S.C. § 2244, if his Rule 12(b)(2) motion were deemed filed under 28 U.S.C. § 2255. The district court denied this application as moot:

The court having ruled on March 11, 1997 denying Mr. Adams's jurisdictional challenge to his conviction, it is too late for him now to withdraw his motion. *Denied.*

(emphasis in original).

Adams appealed the district court's refusal to permit him to withdraw his motion. Initially, this Court treated his appeal as a motion seeking permission to file a second or successive petition. However, we appointed counsel for Adams, and sought briefs from the parties addressing the issues raised by the interface between (i) AEDPA's possessive motion provisions and (ii) our precedents approving the treatment of a postconviction

1. We do not suggest it would be appropriate for a later court to deem the earlier motion as one filed under § 2255 solely because the earlier

attack as a prisoner's sentence, nowever styled, as a § 2255 motion. We now vacate the district court's ruling to withdraw and remand with instructions.

### DISCUSSION

Prior to the enactment of AEDPA district courts routinely converted post-conviction motions of prisoners who unsuccessfully sought relief under some other provision of law into motions under § 2255 and proceeded to determine whether the prisoner was entitled to relief under that statute. This was done most frequently in the cases of pro se litigants who sought relief under a statute or rule that accorded no relief—often Fed.R.Crim.P. 35—in order to determine whether they might be entitled to relief under § 2255, without obligating them to replead their motions. In order to relax formalities that might needlessly frustrate pro se petitioners and because the practice was harmless, afforded the practice. See, e.g., United States v. Detrich, 940 F.2d 37, 38 (2d Cir.1991) (treating motion nominally brought under Fed.R.Crim.P. 35 as motion pursuant to § 2255). The district court followed that well-established practice in this case.

The enactment of AEDPA, however, brings into play new considerations. AEDPA places stringent limits on a prisoner's ability to bring a second or successive application for a writ of habeas corpus under either 28 U.S.C. § 2254 or § 2255. Second or successive applications may be heard only if they involve newly discovered evidence of a potentially dispositive nature, or a new and retroactive rule of constitutional law. See 28 U.S.C. §§ 2255, 2244(b). If a district court receiving a motion under some other provision of law elects to treat it as a motion under § 2255 and then denies it, that may cause the movant's subsequent filing of a motion under § 2255 to be barred as a "second" § 2255 petition. Thus a conversion, initially justified because it harmlessly assisted the prisoner-movant in dealing with legal technicalities, may result in a disastrous elimination of a future opportunity to have a well-justified grievance adjudicated. The court's

court so labelled it. We ruled in *Chambers v. United States,* 106 F.3d 472, 474-75 (2d Cir. 1997) that whether a motion was made under

LEE v. C.I.R.
Cite as 155 F.3d 584 (2nd Cir. 1998)

Affirmed in part, vacated in part, and remanded.

**1. Internal Revenue ☞3282**

Transactions in which taxpayers took out loan to purchase gold and simultaneously entered futures contract to sell the gold at price at which taxpayers would recoup only amount paid for gold and costs of transaction were economically empty; transactions, so taxpayers could not deduct from income their interest expenses, even if debt itself had economic substance in that transactions were liable for repayment of loan. 26 U.S.C.A. § 163.

**2. Internal Revenue ☞3282**

Interest payments are not deductible if they arise from transactions that cannot with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences. 26 U.S.C.A. § 163.

**3. Internal Revenue ☞3071**

In determining whether an activity is engaged in for profit, for income tax purposes, greater weight is given to objective facts than to the taxpayer's mere statement of intent. 26 C.F.R. § 1.183–2(a).

**4. Internal Revenue ☞4743.1**

Whether a transaction lacks economic substance, for income tax purposes, is a question of fact, and Court of Appeals thus reviews Tax Court's finding on that question for clear error.

---

Thomas R. Moore, New York City, for petitioners-appellants.

Donald B. Tobin, Tax Division, United States Department of Justice, Washington, DC, for respondent-appellee (Loretta C. Argrett, Assistant Attorney General; Kenneth L. Greene, on the brief).

BEFORE: CALABRESI, CABRANES, and STRAUB, Circuit Judges.

CALABRESI, Circuit Judge:

Petitioners claim that their payment of certain interest expenses entitles them to tax deductions. The United States Tax Court (Howard A. Dawson, Jr., J.) disallowed the deductions and sustained the Commissioner's claim of a deficiency in petition-

ers' tax payments. We affirm the decision of the Tax Court as to the issues that were before it. We remand the case to the Tax Court for the limited purpose of altering the amount of the petitioners' deficiency, as agreed to by the Commissioner.

## BACKGROUND

The deductions at issue in this case arise out of an illegitimate tax shelter that has been the subject of previous tax litigation. See Saykally v. Commissioner, T.C. Memo. 1991-284, 61 T.C.M. (CCH) 2706, 1991 WL 66620, supplemented by T.C. Memo. 1991-541, 62 T.C.M. (CCH) 116, 1991 WL 215396 (1991). The parties agree that the transactions giving rise to the current litigation are essentially the same as those in Saykally. In brief, the structure of those transactions is as follows:

An "investor" seeking to participate in the tax shelter would borrow a sum of money and use it to buy gold. He would simultaneously enter into a futures contract to sell the gold at a specified later time for a slightly higher price. The price difference was to reflect the costs to the investor of acquiring and holding the gold, including the costs of storage, insurance, and, most importantly, interest on the initial loan. Thus, in real terms, the contract tried to guarantee that the investor would recoup exactly what he paid for the gold, neither more nor less. In the year that the investor borrowed the money, he would deduct the cost of interest and the other "carrying charges." Those deductions were used to offset ordinary income from other sources. Later, when he sold the gold, the investor would report his profit as a capital gain. Between the deferral of income afforded by the deductions for interest and the lower rates of taxation applicable to capital gains, the investor could thus convert tax liabilities at rates of up to 70% payable in a given year to tax liabilities at rates as low as 28% payable in some later year.

The shelter was operated by an entity called Futures Trading, Inc. ("FTI"). Petitioner Dwight Lee was a partner in a group called Peng Partners, which participated in FTI's shelter. The issue before us is whether that participation entitles petitioners to

---

## Left column (separate case)

FEDERAL REPORTER, 3d SERIES

act of conversion which we approved under pre-AEDPA law because it was useful and harmless might, under AEDPA's new law, become extraordinarily harmful to a prisoner's rights. A prisoner convicted pursuant to unconstitutional proceedings might lose the right to have a single petition for habeas corpus adjudicated, solely by reason of a district court's having incorrectly recharacterized some prior motion as one brought under § 2255.

[1–3] At least until it is decided whether such a conversion or recharacterization can affect the movant's right to bring a future habeas petition, district courts should not recharacterize a motion purportedly made under some other rule as a motion made under § 2255 unless (a) the movant, with knowledge of the potential adverse consequences of such recharacterization, agrees to have the motion so recharacterized, or (b) the court finds that, notwithstanding its designation, the motion should be considered as made under § 2255 because of the nature of the relief sought, and offers the movant the opportunity to withdraw the motion rather than have it so recharacterized. Because the district court neither ruled, based on the content of Adams's motion, that it was properly deemed a motion under § 2255, nor obtained Adams's informed consent that his motion should be deemed as made under § 2255, we hold that the district court should not have recharacterized Adams's motion made under Rule 12(b)(2), as one made under § 2255. We therefore vacate the court's order and remand for further proceedings.[2]

§ 2255 should be determined by reference to the relief sought in the motion rather than what label the movant used. We think this would be so for labels applied by the court as well, at least where an application that is really a § 2255 motion is erroneously deemed to be one.

2. We note in addition that, in dealing with the question of possible recharacterization, district judges must be sensitive to another problem arising from AEDPA—its one-year period of limitation for the bringing of petitions under §§ 2254 or 2255. 28 U.S.C. §§ 2244(d), 2255. In order to afford Adams an opportunity to file his first § 2255 motion, provided that he does so promptly,

---

## CONCLUSION

The judgment of the district court is vacated and the case remanded for further proceedings consistent with this opinion.



---

Dwight E. Lee and Leslie E. Lee, Petitioners-Appellants.

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 2-4006.

United States Court of Appeals, Second Circuit.

Argued Aug. 13, 1998.

Decided Aug. 25, 1998.

Taxpayers challenged deficiency assessed by Commissioner of Internal Revenue which arose from nonpayment of disallowed interest deductions. The United States Tax Court, Howard A. Dawson, Jr., J. disallowed deductions and sustained Commissioner's claim of deficiency. Taxpayers appealed. The Court of Appeals, Calabresi, Circuit Judge, held that taxpayers were not entitled to deduct interest paid in connection with economically empty transaction.

Adams's conviction became final on October 7, 1996, when the Supreme Court refused to review it. His habeas motion would therefore be untimely under AEDPA unless brought by October 7, 1997. Because the district court's ruling came at a time when Adams still had several months in which to file a § 2255 motion, but had serious reasons to doubt that he could satisfy AEDPA's stringent standard, the relevant questions, fairness demands that the issue of limitations be tolled to afford Adams an opportunity to file his first § 2255 motion, provided that he does so promptly.

195 FEDERAL REPORTER, 3d SERIES

645

UNITED STATES of America

v.

Quentin MILLER, a.k.a "Q" Quentin
Miller, Appellant.

No. 97-7195.

United States Court of Appeals,
Third Circuit.

Argued Sep. 22, 1999.

Filed Nov. 29, 1999.

Petitioner convicted of drug offenses
filed his pro se post-conviction motions
challenging it before filing this motion

Vacated and remanded.

1. Criminal Law ⟨key⟩997.11

2. Criminal Law ⟨key⟩1083

3. Criminal Law ⟨key⟩272(1),909

4. Indictment and Information ⟨key⟩111

5. Criminal Law ⟨key⟩272(2)(1)

6. Criminal Law ⟨key⟩997.11, 997.12, 997.15

7. Criminal Law ⟨key⟩997

8. Criminal Law ⟨key⟩997.11

9. Criminal Law ⟨key⟩997.11

10. Criminal Law ⟨key⟩997.11, 997.16(2)

11. Criminal Law ⟨key⟩997.11

12. Criminal Law ⟨key⟩997.11

13. Criminal Law ⟨key⟩997.12

14. Criminal Law ⟨key⟩997.12

James V. Wade, Federal Public Defender, Daniel I. Siegel (Argued), Assistant Federal Public Defender, Middle District of Pennsylvania, Harrisburg, PA, for petitioner.

David M. Barasch, United States Attorney, Martin C. Carlson (Argued), Assistant United States Attorney, Harrisburg, PA, for Appellee.

616

197 FEDERAL REPORTER, 3d SERIES

Before: LEVAL, Chief Judge; CARDAMONE, Circuit Judge; and PAULAR, District Judge.

OPINION OF THE COURT

U.S. v. MILLER

Cite as 197 F.3d 644 (2d Cir. 1999)

617

648

649

650

## US FEDERAL REPORTER, 4d SERIES

## U.S. v. MILLER
Cite as 274 F.3d 640 (5th Cir. 2001)

651

# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Thomas K. Kahn
Clerk

In Replying Give Number
Of Case And Names of Parties

October 12, 2001

Charles M. Llewlyn (#60206-004)
BCDF
20 Davidson Dr.
Asheville NC 28801

RE: 00-15230-FF　　USA v. Charles Llewlyn
DC DKT NO.: 00-06022 CR-DMM

The following action has been taken in the referenced case:

YOUR REQUEST ARE BEING RETURNED. THE MANDATE WAS ISSUED ON
JULY 27, 2001.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Carol P. Lewis (404) 335-6175

MOT-2 (1-1999)

August 12, 2001

HONORABLE JUDGE DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT COURT,
301 N. Miami Ave, 6th Floor,
Miami, Florida 33128,

RE: UNITED STATES V CHARLES LLEWLYN
CASE NO 6022 CR DMM

Dear Judge Middlebrooks:
                    In furtherance of my pro se motion to dismiss
the indictment base upon the reinterpretation of law by the Supreme
Court and the adoption of same by the eleventh Circuit, I respectfully
inform this Court of my intention to appeal any adverse ruling to the
Court of appeals.

As indicated in my former missive I'm presently enroute to a Federal
facility unknown at present, however in the abundance of
caution, I hereby give notice if applicable of my intention to
appeal to the eleventh Circuit and respectfully ask for assistance
of competent counsel.

Your Honor, as soon as I'm ensconced in a somewhat permanent
facility I will inform the court of my location. Once again I
thank the court for its patience

                                        Respectfully,
                                        Charles Llewlyn

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

V.

CHARLES LLEWYLN,

     Defendant.

_____/

CASE NO: 6022-Cr-HURLEY-(DMM)

Honorable Judge; Donald M. Middlebrooks:

On May 11, 2000, this Defendant entered a plea of guilty to the above captioned Indictment, at which time counsel petitioned the Court to withold adjudication until time of sentencing, to which the Court was so kind to grant.

After arriving at the Federal Detention Center, I initiated a research to avail myself to this circuit case laws concerning my culpability. And as such the Defendant has arrived at the conclusion to withdraw his plea of guilt for the below reasons:

(1) THE PLEA WAS NOT KNOWINGLY AND VOLUNTARILY ENTERED:

The Defendant contends his plea was not knowingly and vountarily entered as he was not informed by the Court as to the "Mens Rea" element of the instant offense.

The Fourteenth Amendment of the Due process Clause requires that a plea of guilt beknowingly entered, as it involves a number of the Defendants rights. GADDY V. LINAHAN, 780 f2d 935, 943 (11th Cir. 1986) (citation and footnote omitted). A plea of guilty cannot support a judgement of guilt unless it was voluntary in a constitutional sense. HENDERSON V. MORGAN, 426 U.S. 637, 644-45 96 S. Ct. 2253, 2257, 49 L. Ed. 2d 108 (1976) (footnote omitted).

In Henderson cited above the Supreme Court plainly instructed; The voluntariness requirement is not satisfied unless the Defendant receives real notice of the true nature of the charged crime: "[C]learly the plea could not be voluntary in the sense that it constituted an intelligent admission that he

committed the offense unless the Defendant received "real notice of the charge against him; The first and most universally recognized requirement of the Due Process".

This circuit has held that a Defendant does not receive "real notice" of the nature of the charged crime unless he is informed as of the **"Means Rea"** elements of the charged offense. The Defendant receives "real notice" of the charge when he has been informed of both the nature of the charge to which he is pleading guilty and its elements. This is so because a plea of guilty represents, in essence, an admission to every element of the offense. In addition, the Defendant should understand how his conduct satisfies those elements. **GADDY**, 780 f2d at 943-44 (citation omitted); see also **STANO V. DUGGER**, 921 f2d 1125, 1142 (11th Cir. 1991) (en banc) [recognizing that, prior to entering a plea of guilty, a Defendant must receive information on the "nature of the offense and the element of the crime"]. At the very least, Due Process requires that the Defendant, prior to entering a plea of guilty, receive a description of the "critical elements" of the charged offense....**GADDY**, 780 f2d at 945. The Defendant contends that these requirements were not met in accordance with his Due Process rights, equally compelling, is that neither the Defendant nor the Government are bound by plea agreements until they are accepted by the Court, the Defendant points to the record that:

### (2) THE GOVERNMENT BREACHED THE PLEA AGREEMNET:

During the plea colloquy, if the Court recalls, upon examination by the Court if there exists an agreement between the Government and the Defendant, the answer was an unequivocal yes from both parties. Relying on the doctrine of **UNITED STATES V. LADAY**, id. at 56 F. 3rd 24 (5th Cir. 1995) (cooperation agreement implies Government will give adequate opportunity to cooperate); **UNITED STATES V. RINGLING**, 988 f. 2d 504 (4th Cir. 1993) (same)

The Government appears to take the position that it can deal with the Defendant in bad faith so long as it does not discriminate against him on the basis of race or religion. The Government ignores the premise that the "obligation of a contract", in the constitutional sense imputs a legal duty, even upon the sovereign, to perform the specified obligation to that contract. In this case, its the Defendants contention that he was provided with a letter of immunity, at the Governments discretion, as a bargaining chip in plea negotiations, this

inference is evident from the date of plea and letter of immunity.

**(3) GOVERNMENTS PROFFER AND STATEMENTS AT ABORTED SENTENCING HEARING:**

Its the Defendants contention that based upon the Government proffer and statements made at the sentencing hearing, as a matter of law, a factual determination of guilt cannot be found. The Government stated in part that I was in a separate negotiation with the informant, and I was not affirmatively participating in **Gilbornes**, et al conspiracy to distribute drugs in North Carolina.

As the Supreme Court explained in a case involving the sale of prescription drugs one does not become a party to conspiracy by aiding and abetting it, unless he knows of the conspiracy and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally. **DIRECT SALES CO. V. UNITED STATES**, 319(U.S. 703, 709 (1943). The same holds true where the goods sold are illegal narcotics. "The existence of a simple relationship alone does not furnish the requisite conspiritorial agreement. **UNITED STATES V. BROWN**, 872 F. 2d 385 (1989). Assuming for the sake of discussion I knew of the essence of **Gilbornes** et al to distribute drugs, the Government would have to prove I affirmatively participated in that scheme. By the Government own allocution I had nothing to do with the **Gilborne** scheme, see (aborted sentence transcript Sept. 6, 2000 and plea colloquy of May 11th 2000.)

This circuit time, and time again, has indicated that knowledge alone does not satisfy the requisite of conspiritoral agreement. Its the Defendants contention that obtaining a conviction would be contrary to the long established principle of Due Process that all criminal convictions must be proved by evidence necessary to convince a trier of facts beyond a reasonable doubt as to every element of the existence of every element of the offense. **JACKSON V. VIRGINIA**, 443 U.S. 307 (1979). see also **IN RE: WINSHIP**, 397 U.S. 358, 366 (1970).

**(4) PROSECUTORS MISCONDUCT:**

Whilst recognizing the Court does not normally intrude the integrity of the Grand Jury proceedings except to examine claims of perjury pursuant to its supervisory powers. **(perjury is the claim in this instant case)**. The Defendant seeks to show a "prima Facie" claim of Government misconduct, a violation of the 5th Amendment to the U.S. constitution, as such the Defendant seeks to

invoke the Federal Trial Courts inherent powers to supervise its proceedings so as to see justice is done. This is in concert with the Courts powers to interpret the constitution and its supervisory authority over the administration of criminal justice. The dangling inference here is that Agent Barnick made intentional or reckless material statements to Magistrate Judge Snow and Grand Jury, and the U.S. Attorney knowingly acquiesce in the agents conduct. As evident by the DEA-6 report certain statements were attributed to me, that 1 stated "the buyers had purchased a kilo somewhere else", the DEA report goes on to say (1) kilogram of suspected cocaine was recovered from the van, this was the material testimony used to misled the Honorable Judge to believe probable cause existed to arrest, this conspiracy was taken one step further to the heart of the justice system to deprive me of my civil liberties by presenting this perjured material statement to the Grand Jurors of this great country, leaving them no choice but to return a bill of indictment against their fellow men, it goes without saying that this misrepresentation was material to the return of the instant indictment. It should be so noted that upon receipt of this alleged narcotics the lab made a factual determination that this was not **cocaine** but **money**.

Equally alarming is when presented with this issue during cross examination Agent Barnick response was that he was too busy to go back to the Grand Jurors to correct this grave error. Strange as it may seem I agree With Agent Barnick,on the premise that it was not is duty but that of the prosecutor, who seems not to realize that they are the representatives, not of an ordinary party to a controversy.but of a sovereignty whose obligation is to govern impartially is as compelling as its duty to govern at all; and whose interest is not that it shall win a case, but that justice be done. It goes without saying that a prosecutor may not present to a Grand Jury evidence which he knows to be **false** or **misleading**. A corollary to this principle is that, once a prosecutor has discovered perjured testimony was offered s/he must make this known to all parties, the Court and the Grand Jury, so that the Grand Jury may reconsider the indictment. The alternative measure is dismissal if the perjured testimony,as alleged,is found to be material to the indictment.

## (5) The Apprendi Issue

The Defendant was charged in an indictment under the statue of 841 which provides for different sentences based on the quantity of drugs involved. Because the amount of drugs at issue could materially alter the sentence to which a defendant is exposed under **APPRENDI**, THE QUANTITY OF DRUGS IS AN an element of the offense that the government must prove to a jury beyond a reasonable doubt. Llewyln et. al. indictment did not specify, a specific amount of drugs for which he could be accountable, neither did the Defendant plead to an amount. Accordingly in order to preserve and protect Defendant Sixth (6) and Fourteenth (14) Amendment under the United States Constitution, is even a more compelling reason for this Court not to adjudicate guilt.

## (6) Counsel

Mr Philip Horowitz, Esq, is the Attorney of record, his conduct throughout the past months have been above board thus far as my limited knowledge of the law is concern. However I strongly feel that both counsel and I was misled by the government as to any future cooperation which would have had an impact on my exposure, this misconception was presented to me leaving me with the understanding that a departure was forthcoming. Upon receipt of this letter counsel may seek to withdraw base upon all the constitutional issues I have raised and may have cast a doubt as to his effectiveness, as previously stated I believe counsel was misled.

## Defendants Prayer

The Defendant implores this Court to accept this letter as a Pro Se Motion to withdraw his plea under the applicable rules governing such conduct and any other relief this Honorable Court deems justified in accordance with this Court supervisory power in the administration of criminal justice. This Court is Defendant's only advocate in preventing a grave constitutional violation. This Circuit has long since held that any persons who has to stand trial on perjured testimony is a violation of the **Due Process Clause Of the Fifth Amendment of the United States Constitution.**

Respectfully Submitted,

Charles Llewyln

Reg.#60206-004

F.D.C.-Miami

P.O Box 019120

Miami-Florida 33101-9120

Clerk of Court,
United States District Court
Southern District of Florida
701 Clematis Street
West Palm Beach, Florida                        November 11,2001

---

IN RE: Case No. 01-7261-Civ-Middlebrooks

---

   Dear Clerk of Court:

                        Respectfully I submit this letter to obtain

a copy of Magistrate Judge Charlene Sorrentino recommendation  in  the

above styled case.

   As indicative of Judge Middlebrooks Order of October 19, 2001  ,

I have yet to recieve said Order. In respect to my motion for reconsi-

deration and tentative notice of appeal, could you advise if has  been

docketed, and provide me with a copy of the filed notice of appeal.

   Thanking you kindly for your assistance.


                        Respectfully Submitted,

                        *Charles Llewlyn*
                        Charles Llewlyn #60206-004
                        2680 Highway, 301 South
                        Jesup, Georgia 31599

# The Declaration of Independence

### Exhibit-4

## IN CONGRESS, JULY 4, 1776.

### A DECLARATION BY THE REPRESENTATIVES OF THE UNITED STATES OF AMERICA, IN GENERAL CONGRESS ASSEMBLED.

WHEN in the Course of human Events, it becomes necessary for one People to dissolve the Political Bonds which have connected them with another, and to assume among the Powers of the Earth, the separate and equal Station to which the Laws of Nature and of Nature's God entitle them, a decent Respect to the Opinions of Mankind requires that they should declare the causes which impel them to the Separation.

We hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the Pursuit of Happiness—That to secure these Rights, Governments are instituted among Men, deriving their just Powers from the Consent of the Governed, that whenever any Form of Government becomes destructive of these Ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its Foundation on such Principles, and organizing its Powers in such Form, as to them shall seem most likely to effect their Safety and Happiness. Prudence, indeed, will dictate that Governments long established should not be changed for light and transient Causes; and accordingly all Experience hath shewn, that Mankind are more disposed to suffer, while Evils are sufferable, than to right themselves by abolishing the Forms to which they are accustomed. But when a long Train of Abuses and Usurpations, pursuing invariably the same Object, evinces a Design to reduce them under absolute Despotism, it is their Right, it is their Duty, to throw off such Government, and to provide new Guards for their future Security. Such has been the patient Sufferance of these Colonies; and such is now the Necessity which constrains them to alter their former Systems of Government. The History of the present King of Great-Britain is a History of repeated Injuries and Usurpations, all having in direct Object the Establishment of an absolute Tyranny over these States. To prove this, let Facts be submitted to a candid World.

He has refused his Assent to Laws, the most wholesome and necessary for the public Good.

He has forbidden his Governors to pass Laws of immediate and pressing Importance, unless suspended in their Operation till his Assent should be obtained; and when so suspended, he has utterly neglected to attend to them.

He has refused to pass other Laws for the Accommodation of large Districts of People, unless those People would relinquish the Right of Representation in the Legislature, a Right inestimable to them, and formidable to Tyrants only.

He has called together Legislative Bodies at Places unusual, uncomfortable, and distant from the Depository of their public Records, for the sole Purpose of fatiguing them into Compliance with his Measures.

He has dissolved Representative Houses repeatedly, for opposing with manly Firmness his Invasions on the Rights of the People.

He has refused for a long Time, after such Dissolutions, to cause others to be elected; whereby the Legislative Powers, incapable of Annihilation, have returned to the People at large for their exercise; the State remaining in the mean time exposed to all the Dangers of Invasion from without, and Convulsions within.

He has endeavoured to prevent the Population of these States; for that Purpose obstructing the Laws for Naturalization of Foreigners; refusing to pass others to encourage their Migrations hither, and raising the Conditions of new Appropriations of Lands.

He has obstructed the Administration of Justice, by refusing his Assent to Laws for establishing Judiciary Powers.

He has made Judges dependent on his Will alone, for the Tenure of their Offices, and the Amount and Payment of their Salaries.

He has erected a Multitude of new Offices, and sent hither Swarms of Officers to harrass our People, and eat out their Substance.

He has kept among us, in Times of Peace, Standing Armies, without the consent of our Legislatures.

He has affected to render the Military independent of and superior to the Civil Power.

He has combined with others to subject us to a Jurisdiction foreign to our Constitution, and unacknowledged by our Laws; giving his Assent to their Acts of pretended Legislation:

For quartering large Bodies of Armed Troops among us:

For protecting them, by a mock Trial, from Punishment for any Murders which they should commit on the Inhabitants of these States:

For cutting off our Trade with all Parts of the World:

For imposing Taxes on us without our Consent:

For depriving us, in many Cases, of the Benefits of Trial by Jury:

For transporting us beyond Seas to be tried for pretended Offences:

For abolishing the free System of English Laws in a neighbouring Province, establishing therein an arbitrary Government, and enlarging its Boundaries, so as to render it at once an Example and fit Instrument for introducing the same absolute Rule into these Colonies:

For taking away our Charters, abolishing our most valuable Laws, and altering fundamentally the Forms of our Government:

For suspending our own Legislatures, and declaring themselves invested with Power to legislate for us in all Cases whatsoever.

He has abdicated Government here, by declaring us out of his Protection and waging War against us.

He has plundered our Seas, ravaged our Coasts, burnt our Towns, and destroyed the Lives of our People.

He is, at this Time, transporting large Armies of foreign Mercenaries to compleat the Works of Death, Desolation, and Tyranny, already begun with circumstances of Cruelty and Perfidy, scarcely paralleled in the most barbarous Ages, and totally unworthy the Head of a civilized Nation.

He has constrained our fellow Citizens taken Captive on the high Seas to bear Arms against their Country, to become the Executioners of their Friends and Brethren, or to fall themselves by their Hands.

He has excited domestic Insurrections amongst us, and has endeavoured to bring on the Inhabitants of our Frontiers, the merciless Indian Savages, whose known Rule of Warfare, is an undistinguished Destruction of all Ages, Sexes and Conditions.

In every stage of these Oppressions we have Petitioned for Redress in the most humble Terms: Our repeated Petitions have been answered only by repeated Injury. A Prince, whose Character is thus marked by every act which may define a Tyrant, is unfit to be the Ruler of a free People.

Nor have we been wanting in Attentions to our British Brethren. We have warned them from Time to Time of Attempts by their Legislature to extend an unwarrantable Jurisdiction over us. We have reminded them of the Circumstances of our Emigration and Settlement here. We have appealed to their native Justice and Magnanimity, and we have conjured them by the Ties of our common Kindred to disavow these Usurpations, which, would inevitably interrupt our Connections and Correspondence. They too have been deaf to the Voice of Justice and of Consanguinity. We must, therefore, acquiesce in the Necessity, which denounces our Separation, and hold them, as we hold the rest of Mankind, Enemies in War, in Peace, Friends.

We, therefore, the Representatives of the UNITED STATES OF AMERICA, in GENERAL CONGRESS, Assembled, appealing to the Supreme Judge of the World for the Rectitude of our Intentions, do, in the Name, and by Authority of the good People of these Colonies, solemnly Publish and Declare, That these United Colonies are, and of Right ought to be, FREE AND INDEPENDENT STATES; that they are absolved from all Allegiance to the British Crown, and that all political Connection between them and the State of Great-Britain, is and ought to be totally dissolved; and that as FREE AND INDEPENDENT STATES, they have full Power to levy War, conclude Peace, contract Alliances, establish Commerce, and to do all other Acts and Things which INDEPENDENT STATES may of right do. And for the support of this Declaration, with a firm Reliance on the Protection of divine Providence, we mutually pledge to each other our Lives, our Fortunes, and our sacred Honor.

*Signed by ORDER AND IN BEHALF of the CONGRESS,*

JOHN HANCOCK, PRESIDENT.

ATTEST,

CHARLES THOMSON, SECRETARY.

## [SIGNERS OF THE DECLARATION OF INDEPENDENCE[1]]

### John Hancock

| | | | | | |
|---|---|---|---|---|---|
| NEW-HAMPSHIRE | Josiah Bartlett. Wm. Whipple. Matthew Thornton.[2] | NEW-YORK | Wm. Floyd. Phil. Livingston. Frank. Lewis. Lewis Morris. | Robt. Morris. Benjamin Rush. Benja. Franklin. John Morton. Geo. Clymer. Jas. Smith. Geo. Taylor. James Wilson. Geo. Ross. | George Wythe. Richard Henry Lee. Tho. Jefferson. Benja. Harrison. Thos. Nelson. jr. Francis Lightfoot Lee. Carter Braxton. |
| MASSACHUSETTS BAY. | Saml. Adams. John Adams. Robt. Treat Paine. Elbridge Gerry. | NEW-JERSEY | Richd. Stockton. Jno. Witherspoon. Fras. Hopkinson. John Hart. Abra. Clark. | PENNSYLVANIA | VIRGINIA. |
| RHODE ISLAND AND PROVIDENCE, &c. | Step. Hopkins. William Ellery. | | | | Wm. Hooper. Joseph Hewes. John Penn. |
| CONNECTICUT. | Roger Sherman. Saml. Huntington. Wm. Williams. Oliver Wolcott. | DELAWARE. | Caesar Rodney. Geo. Read. (Tho. McKean).[3] | NORTH-CAROLINA. | |
| | | MARYLAND. | Samuel Chase. Wm. Paca. Thos. Stone. Charles Carroll, of Carrollton. | SOUTH-CAROLINA. | Edward Rutledge. Thos. Heyward, jun. Thomas Lynch, jun. Arthur Middleton. |
| | | | | GEORGIA. | Button Gwinnett. Lyman Hall. Geo. Walton. |

1 Based upon the authenticated list printed by order of Congress on January 18, 1777.
2 Matthew Thornton . . .

AMERICANS, UNDER Title 18 USC § 4, and TITLE 18 USC § 2382
YOU BECOME A [PRINCIPAL] AND ARE LIABLE FOR YOUR INACTION:
11/3/2000

Before the 1776 Declaration, ALFRED THE GREAT 'HUNG' 45 Judges for placing their OPINION above the LAW:
=1787==THE CONSTITUTION OF THE UNITED STATES

"EXHIBIT-2"

PREAMBLE

We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America

Article 1 ******

**Section 9.** [1] The Migration or Importation of Such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person.

***[2] The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.****

[3] No Bill of Attainder or ex post facto Law shall be passed

[4] No Capitation, or other direct Tax, shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken

[5] No Tax or Duty shall be laid on Articles exported from any State.

[6] No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State be obliged to enter, clear, or pay Duties in another

[7] No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time

[8] No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

****Section 10.** [1] No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility. **

ARTICLE VI ***** *

[1] All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

***[2] This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.***

****[3] The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.****

"EXHIBIT-2"

*****"U. S. vs. Stewart, 234 F. Supp. 94 (1964): ****
Government officers may be sued only if he acts in
excess of his statutory authority in violation of
the Constitution or refuses to act in cases to represent Govt."

[Section 2.] [1] The Judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office.

**Section 2.** [1] The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under the Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

[2] In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be a Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

[3] The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Places as the Congress may by Law have directed

**Section 3.** [1] Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

Article IV

**Section 1.** Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof

**Section 2.** [1] The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

[2] A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

[3] No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.

**Section 3.** [1] New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

[2] The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

**Section 4.** The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

EXHIBIT-1

'Government officers may be sued only if he acts in excess of his statutory authority or in violation of the Constitution for then he ceases to represent government'.

**U. S. vs. Stewart, 234 F. Supp. 94 (1964)**

## EXHIBIT-3

ARTICLES IN ADDITION TO, AND AMENDMENT OF, THE CONSTITUTION OF THE UNITED STATES OF AMERICA PROPOSED BY CONGRESS, AND RATIFIED BY THE LEGISLATURES OF THE SEVERAL STATES PURSUANT TO THE FIFTH ARTICLE OF THE ORIGINAL CONSTITUTION.

PREAMBLE

The ratification of the Conventions of nine States shall be sufficient for the Establishment of this Constitution between the States so ratifying the Same.

AMENDMENT I  [1791]

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

AMENDMENT II  [1791]

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

AMENDMENT III  [1791]

No Soldier shall in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

AMENDMENT IV  [1791]

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

AMENDMENT V  [1791]

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property; without due process of law; nor shall private property be taken for public use, without just compensation.

AMENDMENT VI  [1791]

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

AMENDMENT VII  [1791]

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

AMENDMENT VIII  [1791]

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

AMENDMENT IX  [1791]

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people

AMENDMENT X  [1791]

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people

## EXHIBIT-3

'William Shakespear's Play' KING HENRY the Sixth, Part 2,
'The first thing we do, lets kill all Lawyers'
"Shakespear", said this not ME.